455 S.E.2d 734 (1995)
20 Va. App. 142
FAUQUIER COUNTY DEPARTMENT OF SOCIAL SERVICES, Fauquier County Community Policy and Management Team, Fauquier County School Board, Fauquier Family Guidance Services, and Fauquier County Family Assessment and Planning Team,
v.
Timothy Elliott ROBINSON and Charlene Banks Robinson.
Record No. 0690-94-4.
Court of Appeals of Virginia, Alexandria.
April 4, 1995.
*735 Kevin J. Burke, Deputy Fauquier County Atty. (Paul S. McCulla, Fauquier County Atty.; Fauquier County Attorney's Office, on briefs), for appellants.
Sandra L. Havrilak, Fairfax (Marlene M. Hahn, Havrilak & Hahn, P.C., on brief), for appellees.
Present: WILLIS, BRAY and FITZPATRICK, JJ.
FITZPATRICK, Judge.
The Fauquier County Department of Social Services, the Fauquier County Community Policy and Management Team, the Fauquier County School Board, Fauquier Family Guidance Services, and the Fauquier County Family Assessment and Planning Team (appellants) appeal the placement of Timothy and Charlene Robinson's daughter in a residential treatment facility. Appellants argue that: (1) the circuit court lacked jurisdiction to hear the parents' petition seeking residential treatment for their daughter; (2) the parents failed to exhaust required administrative remedies; and (3) residential treatment was not the least restrictive alternative *736 available to the court as a treatment option. Finding no error, we affirm the trial court.

THE ACT
This case requires an initial determination of the scope of the Comprehensive Services Act for At-risk Youth and Families (CSA) that became effective in July 1993. See Code §§ 2.1-745 to 2.1-759.1. The CSA establishes a system of teams to administer state funds available to troubled children and their families. Every county, city, or combination of counties and cities is required under the CSA to designate a Community Policy and Management Team (CPMT), whose members are appointed by the local governing body. Code § 2.1-750. The CPMT includes local agency heads or their designees from (1) the community services board, (2) the juvenile court services unit, (3) the department of health, (4) the department of social services, (5) the local school division, and (6) a private organization providing children's or family services. Code § 2.1-751. The CPMT also has a parent representative who is not employed by any program serving the community's children and families. Id.
Each local CPMT must establish at least one Family Assessment and Planning Team (FAPT), whose members include representatives with authority to access services from (1) the community services board, (2) the juvenile court services unit, (3) the department of health, (4) the department of social services, and (5) the local school division, and a parent representative who is not employed by any program serving children and families. Code § 2.1-753.
The CSA is funded by a state pool of funds under Code § 2.1-757(A) and by a state trust fund established pursuant to Code § 2.1-759(A). In creating the state pool of funds, the General Assembly appropriates monies sufficient to meet the relevant federal mandates for the provision of services. Code § 2.1-757(C). The state trust fund also contains funds appropriated by the General Assembly, including monies from the state general fund, federal grants, and private foundations. Code § 2.1-759(A).
In administering the CSA's available funds, the FAPT first identifies the services required for a family and child. Code § 2.1-754. As a part of this process, the FAPT must (1) "[p]rovide for family participation in all aspects of assessment, planning and implementation of services" and (2) develop a services plan that "provides for appropriate and cost-effective services." Code § 2.1-754(2)-(3). The CPMT reviews the FAPT's recommendations and requests for funding. Code § 2.1-752(4). The CSA then mandates the expenditure of funds for youths within certain target populations. Code § 2.1-757(A)-(B). Once the FAPT makes a recommendation for services, the courts "may make such other disposition as is authorized or required by law" after considering the FAPT's recommendation. Code § 2.1-757(E).

BACKGROUND
In April 1992, Dr. Lynne Hahnemann of Fauquier Family Guidance Services (FFGS) began treating the daughter of Timothy and Charlene Robinson (the parents). Throughout treatment, Dr. Hahnemann observed the following behaviors and symptoms in the child's behavior: (1) physical aggression toward her brother and parents; (2) noncompliance; (3) explosive outbursts; (4) persistent homicidal ideations; and (5) developmental delay. From April to December 1992, Dr. Hahnemann noticed marginal improvement in the child's behavior, but aggression and hostility toward her brother continued and at times became acute. Dr. Hahnemann diagnosed the child as having a conduct disorder, dysthymia (low-level depression), and attention deficit hyperactivity disorder (ADHD).
In October 1992, the child entered her brother's bedroom at night with a pair of scissors and stood beside his bed intending to kill him. She was hospitalized at the Virginia Treatment Center for Children as a result of this incident, and upon discharge, the child was medicated and the family cautioned to monitor and separate the child and her brother. The child's aggressive behavior continued, and in May 1993, she again took a knife from the kitchen and told a friend of her intention to kill her brother. She was hospitalized at DeJarnette State Hospital for *737 Children with Psychiatric Problems. The hospital recommended residential treatment, and upon discharge, advised an out-of-home placement.
In July 1993, Dr. Hahnemann, still the child's treating therapist, became a member of the newly created Fauquier County FAPT and presented her case to the FAPT. The FAPT treated the child as one covered by the CSA pursuant to Code § 2.1-757(B)(3), which provides that the target populations of the CSA include "[c]hildren for whom foster care services ... are being provided to prevent foster care placements."[1] In an August 11, 1993 letter, the Fauquier County CPMT also acknowledged that the child was "a mandated child in that she is a child in need of preventive foster care services, i.e. at risk of foster care placement within six months if services are not provided."
Consequently, the FAPT developed a service plan for the child that recommended residential treatment. The CPMT rejected the plan and suggested that a less restrictive alternative was more appropriate. In August 1993, the FAPT and the CPMT developed an intermediate plan that provided the child and her family with intensive in-home services, including a mentor[2] and in-home counseling, for a thirty-day period. In addition, the parents installed an alarm on the child's bedroom door to protect the family if the mentor fell asleep. The child cut the wires on the alarm and destroyed it and the door three times. Dr. Hahnemann noticed no improvement in the child's aggressive behavior as a result of this more intensive service.
A day treatment service program was approved by the FAPT and the CPMT in September 1993. The parents refused to sign this plan because of a disagreement over transportation provisions and mentoring hours. Services were provided under the day treatment plan without the parents' signatures. The CPMT notified the parents on October 21, 1993 that the child's services would terminate if the parents did not sign the day treatment plan.
On November 1, 1993, the child was hospitalized at Charter Westbrook Hospital because of a suicide attempt. The hospital and Dr. Hahnemann again recommended that the child be placed in a residential treatment facility, and the hospital prescribed Mellaril, an antipsychotic medication. The FAPT developed two service plans to provide services for the child upon her release from Charter Westbrook, one for residential treatment and one for therapeutic foster care. The "majority plan," recommending foster care, was developed without the participation of the parents or the child's therapist, Dr. Hahnemann. On November 23, 1993, the father signed the majority plan with this qualification: "This plan is being signed so my daughter is not denied service. I do not consent or agree with a foster care placement."
The CPMT did not consider the majority plan at its November meeting because the FAPT had not formally approved the plan and the parents had not signed the plan. The father refused to sign a waiver relieving the county of responsibility for procedural irregularities or to sign the plan without qualification. The CPMT denied services to the child after November 23, 1993.
On December 2, 1993, after the termination of services, the parents petitioned the Fauquier County Juvenile and Domestic Relations District Court (J & DR court) to order a residential treatment placement for their daughter pursuant to Code §§ 16.1-278(A)[3] and 2.1-757(E).[4] On December 8, *738 1993, appellants filed a motion to dismiss and argued that: (1) the J & DR court had no jurisdiction to hear the parents' petition, and (2) the parents had an adequate administrative remedy under the CSA.
The J & DR court granted the motion to dismiss on December 13, 1993. The parents appealed to the trial court, which on December 20, 1993 ruled that: (1) it had jurisdiction to hear the petition pursuant to Code § 16.1-241(G); (2) it had authority to order the relief requested under Code § 16.1-278(A); and (3) it had authority to make a different disposition under the CSA than that recommended by the FAPT pursuant to Code § 2.1-757(E).
The circuit court held several evidentiary hearings to determine the appropriate treatment for the child. At these hearings, Dr. Hahnemann consistently recommended residential treatment as the best solution for this child, especially in light of her hostile and threatening behavior toward her brother and herself. Dr. Hahnemann testified that it was likely the child could harm someone other than her brother and indicated several concerns about therapeutic foster care: (1) that the progression of the child's behavior from physical aggression to acting out homicidal ideations and stealing would not be remedied by foster care; (2) that the child was young and needed intensive treatment in an effort to prevent later problems; and (3) that the day treatment program, which was more restrictive and intensive than foster care, had not produced any significant changes in the child's behavior. After the hearings began, the mentor noticed an increased stress level in the home and relayed his observations to Dr. Hahnemann. Another incident of physical aggression occurred on February 28, 1994, when the child attacked her brother in the kitchen.
In the March 17, 1994 final decree, the court ordered the child placed at the Barry Robinson Center, a residential treatment facility. The court found that foster care placement was not an available option "because the Commonwealth of Virginia has imposed a burden on placing a child into therapeutic foster care that cannot be met unless the parents voluntarily give up custody, an option [the parents] are unwilling to entertain." Of the remaining available options, the court determined that residential treatment at the Barry Robinson Center was in the child's best interests.

JURISDICTION
In its December 20, 1993 order, the trial court determined it had jurisdiction to hear the parents' petition pursuant to Code §§ 16.1-241(G), 16.1-278, and 2.1-757(E). Appellants argue that none of these Code sections establishes an independent right of action to have a court review a service plan developed by the FAPT and CPMT, and that the court's exercise of jurisdiction over the parents' petition was improper.
Code § 16.1-241(G) provides a juvenile and domestic relations court with jurisdiction over "[p]etitions filed by or on behalf of a child ... for the purpose of obtaining treatment, rehabilitation or other services which are required by law to be provided for that child." The CSA requires the expenditure of funds from the state pool or the state trust fund on "public or private nonresidential or residential services" for children within certain designated target populations. Code § 2.1-757(A)-(B). The CSA gives courts authority to review FAPT recommendations.
In any matter properly before a court wherein the family assessment and planning team has recommended a level of treatment and services needed by the child and family, the court shall consider the recommendations of the family assessment and planning team. However, the court may make such other disposition as is authorized or required by law, and services ordered pursuant to such disposition shall qualify for funding under this section. *739 Code § 2.1-757(E) (emphasis added). In this case, the child was receiving preventive foster care services and qualified for funding under Code § 2.1-757(B)(3). The FAPT had made a recommendation of therapeutic foster care, and the court could determine whether that decision was in the best interests of this child. The parents had the right under Code § 16.1-241(G) to request the "residential services" mandated by the CSA.
In addition, Code § 16.1-278(A) authorizes judges to "order ... any state, county or municipal officer or employee or any governmental agency or other governmental institution to render only such information, assistance, services and cooperation as may be provided for by state ... law." The teams created under the CSA qualify as "any governmental agency or other governmental institution." The local governing body creates the CPMT, which in turn chooses the members of the FAPT, and all members of both teams are immune from civil liability, except in cases of malicious intent. See Code §§ 2.1-751, -753. The teams are local governmental institutions that make policy, plan service programs, and fund these programs with money appropriated by the General Assembly. See Code §§ 2.1-752, -754. Thus, the trial court had authority to compel the FAPT and the CPMT to provide any necessary services.
The trial court did not err in exercising jurisdiction over the parents' petition for services. The "matter" in the instant case was properly before the court pursuant to the parents' petition for residential treatment under Code §§ 16.1-241(G), 16.1-278, and 2.1-757(E).

EXHAUSTION OF ADMINISTRATIVE REMEDIES
Appellants also argue that the parents' claim is barred because they failed to exhaust possible remedies available to them through the planning process before filing their petition.
"It is a `long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.' " Philip Morris, Inc. v. Block, 755 F.2d 368, 369 (4th Cir.1985) (quoting Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459, 463-64, 82 L.Ed. 638 (1938)). Under the Virginia Administrative Process Act (VAPA), Code §§ 9-6.14:1 to 9-6.14:25, a party must pursue administrative avenues that result in agency regulations and final case decisions before seeking judicial review. Code § 9-6.14:16(A).
Appellants' exhaustion argument is without merit. First, the parents' petition was a petition for services, not an appeal of an administrative case decision. Indeed, the trial court found that "this matter rests somewhat apart from ... the administrative process. I do not, for example, see this as an exhaustion case." The court exercised jurisdiction over the petition pursuant to Code §§ 16.1-241(G), 16.1-278(A), and 2.1-757(E), not pursuant to Code § 9-6.14:16(A), the judicial review provision of the VAPA.
In addition, under the VAPA, an agency is "any authority, instrumentality, officer, board or other unit of the state government empowered by the basic laws to make regulations or decide cases." Code § 9-6.14:4(A) (emphasis added). The VAPA specifically exempts from coverage "[m]unicipal corporations, counties, and all local, regional or multijurisdictional authorities created under [the] Code." Code § 9-6.14:4.1(A)(5). The local teams established by the CSA are not state agencies subject to VAPA requirements and, thus, qualify for the local authorities exemption under Code § 9-6.14:4.1(A)(5). Like a local school board, each team "is not a board or unit of the state government but rather is an entity of a municipality or county." Schwartz v. Highland County School Bd., 2 Va.App. 554, 556, 346 S.E.2d 544, 545 (1986).
Finally, nothing in the CSA indicates mandatory administrative procedures for a petitioner to follow before seeking court review of services. Thus, the trial court did not err in finding that the only predicate to judicial action was a proper request for services and a FAPT recommendation.

*740 RESIDENTIAL TREATMENT
Finally, appellants argue that the trial court erred in ordering the child placed in a residential treatment facility, even though therapeutic foster care was a less restrictive alternative. Appellants contend that the judge should have compelled the parents to enter into a temporary entrustment agreement pursuant to Code §§ 63.1-56 and 16.1-277 so that the child could be placed in therapeutic foster care.
"`In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and foster a child's best interests.' " Logan v. Fairfax County Dep't of Human Dev., 13 Va.App. 123, 128, 409 S.E.2d 460, 463 (1991) (quoting Farley v. Farley, 9 Va.App. 326, 328, 387 S.E.2d 794, 795 (1990)). "On appeal, we review the evidence in the light most favorable to the prevailing party below. `The trial court's decision, when based upon an ore tenus hearing, is entitled to great weight and will not be disturbed unless plainly wrong or without evidence to support it.' " Hughes v. Gentry, 18 Va.App. 318, 321-22, 443 S.E.2d 448, 451 (1994) (citation omitted) (quoting Venable v. Venable, 2 Va.App. 178, 186, 342 S.E.2d 646, 651 (1986)).
The CSA's purposes are to: (1) "[e]n sure that services and funding are consistent with the Commonwealth's policies of preserving families and providing appropriate services in the least restrictive environment, while protecting the welfare of children and maintaining the safety of the public" and (2) "[d]esign and provide services that are responsive to the unique and diverse strengths and needs of troubled youths and families." Code § 2.1-745(1), (3). Under the CSA, the trial judge has discretion to make a disposition other than the one recommended by the FAPT. See Code § 2.1-757(E).
In this case, the evidence clearly supports the trial judge's placement of the child in a residential treatment facility. The judge considered the FAPT's recommendation of therapeutic foster care and found it was not an available option. He recognized that "the parents of this child would by preference ... have her in a residential program, and that is supported by the therapists or therapists who were most intimately connected to the care of the child." Dr. Hahnemann, the child's therapist who had worked with her since April 1992, repeatedly recommended residential treatment and observed the gradual deterioration of the child's behavior. In addition, Charter Westbrook, where the child received care after her November 1993 suicide attempt, recommended a residential treatment facility. This record establishes that the in-home counseling, mentoring, and day treatment services were not effective in this child's case. The trial judge thoroughly considered specific residential treatment programs before deciding to place the child at the Barry Robinson Center.
Appellants focus on the least restrictive environment aspect of the CSA's purpose and ignore the intent of "protecting the welfare of children and maintaining the safety of the public." See Code § 2.1-745(1). The child in this case was a danger to her brother, her parents, herself, and the community. Although therapeutic foster care may be a less restrictive environment, the evidence established that residential treatment is in the best interests of this child.
Accordingly, we affirm the decision of the trial court.
Affirmed.
NOTES
[1] Former Code § 63.1-55.8 defined "foster care services" as "services which are provided for a planned period of time in order to prevent foster care placement."
[2] A mentor would stay in the home from 9:00 p.m. until 8:00 a.m. seven days a week to provide a safe sleeping environment for the family.
[3] Code § 16.1-278(A) provides, in pertinent part, that:

[t]he judge may order ... any state, county or municipal officer or employee or any governmental agency or other governmental institution to render only such information, assistance, services and cooperation as may be provided for by state ... law.
[4] Code § 2.1-757(E) provides that:

[i]n any matter properly before a court wherein the family assessment and planning team has recommended a level of treatment and services needed by the child and family, the court shall consider the recommendations of the family assessment and planning team. However, the court may make such other disposition as is authorized or required by law, and services ordered pursuant to such disposition shall qualify for funding under this section.